67 F.3d 947
 314 U.S.App.D.C. 253, Util. L. Rep. P 14,068
 CITY OF NEW ORLEANS, LOUISIANA, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Mississippi Public Service Commission, and Louisiana Public
Service Commission, Intervenors.
 Nos. 94-1340, 94-1345.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 26, 1995.
Decided Oct. 20, 1995.
 
 Paul E. Nordstrom argued the cause, for petitioner City of New Orleans, with whom Clinton A. Vince, Glen L. Ortman and Michael W. Tifft were on the briefs, for petitioner City of New Orleans.
 Floyd L. Norton, IV argued the cause, for petitioners Entergy Corporation, et al., petitioners in No. 94-1345 and intervenors in No. 94-1340, with whom Bruce L. Richardson was on the briefs. Glen S. Bernstein and William M. Dudley entered appearances, for petitioners Entergy Corporation, et al.
 Jill L. Hall, Attorney, Federal Energy Regulatory Commission, argued the cause, for respondent, with whom Jerome M. Feit, Solicitor, and Joseph S. Davies, Jr., Deputy Solicitor, Federal Energy Regulatory Commission, were on the brief, for respondent.
 George M. Fleming and William B. McKinley entered appearances, for intervenor Mississippi Public Service Commission.
 Michael R. Fontham and Noel J. Darce entered appearances, for intervenor Louisiana Public Service Commission.
 Before: EDWARDS, Chief Judge, WALD and RANDOLPH, Circuit Judges.
 WALD, Circuit Judge:
 
 
 1
 This case involves a decision by the Federal Energy Regulatory Commission ("FERC" or "the Commission") to allow the spin-off of two electricity generating plants by Entergy, a holding company which owns four subsidiary utility companies. The City of New Orleans ("CNO"), claiming that New Orleans ratepayers will suffer harm from FERC's decision, and Entergy, the holding company, both challenge the Commission's Order for addressing the "prudence" of the spin-off only as to its current effect on rates up until such time as the utility system will need to purchase new capacity. Both petitioners, while disagreeing on the final result of a prudence analysis, agree that FERC must consider now the reasonableness of the ultimate effect the addition of replacement capacity will have on rates. We hold that FERC's decision to defer any prudence determination affecting rates based on replacement capacity until such time as that occurs is a reasonable one and deserves our deference.
 
 I. BACKGROUND
 A. The Entergy System
 
 2
 Entergy Corporation, a holding company, owns four utility operating companies and a generating company which together form the integrated Entergy System ("System"). The four companies--New Orleans Public Service, Inc. ("NOPSI"), Louisiana Power & Light ("LP & L"), Mississippi Power & Light ("MP & L"), and Arkansas Power & Light ("AP & L")--provide electric services to consumers in Louisiana, Mississippi and Arkansas, in accordance with a series of contracts known as the Entergy System Agreement ("System Agreement"). The System Agreement, which governs the planning, construction, and operation of the generating and transmitting facilities, is subject to FERC oversight.
 
 
 3
 Pursuant to the System Agreement, imbalances associated with the costs of plants assigned to individual operating companies are shared, to an extent, by the other operating companies. For example, Service Schedule MSS-1 in the System Agreement provides for companies which own a share of the total system generating capacity that is less than their share of total system demand ("short" companies) to make equalization payments to the companies which own a share of capacity greater than their share of system demand ("long" companies).
 
 
 4
 Another service schedule (MSS-3) provides for the coordinated dispatch and purchase of economy energy. Under a method known as economic dispatch, System generating plants provide the operating companies with the lowest-cost energy available. Subject to certain technological constraints, the lowest-cost resources are run first, without regard to ownership (except that the operating company with responsibility for a plant has first call on the energy generated by that particular facility). The energy generated in excess of an operating company's consumption is allocated to the other operating companies.
 
 B. The Spin-Off
 
 5
 In 1990, AP & L, one of Entergy's utility companies, sold a substantial interest in two generating plants to Entergy Power, Inc. ("EPI"), a newly-created subsidiary of Entergy. AP & L had more generating capacity than required to meet its immediate needs, and no other company in the Entergy System wished to purchase the excess capacity. Thus, in order to avoid generating more energy than could be used by the System, Entergy sought permission from FERC, the Securities and Exchange Commission ("SEC"), and the Arkansas Public Service Commission ("APSC"), which governs rate regulation in Arkansas, to spin-off AP & L's two excess generating plants and transfer them to the new subsidiary for eventual sale to unaffiliated purchasers.
 
 
 6
 Although the two generators were producing excess capacity in the 1980s and early 1990s, and thus burdening the System, there is evidence to suggest that the System eventually will need that extra power. If and when that time comes, presumably in the next century, the System will have to purchase additional capacity to replace the power originally generated by the two spun-off facilities. These costs, central to the instant dispute, are referred to as "replacement capacity costs."
 
 
 7
 The APSC and the SEC approved the sale, and the transfer to EPI took place in August, 1990. However, in 1992, this court remanded the matter to the SEC for reconsideration in City of New Orleans v. SEC, 969 F.2d 1163 (D.C.Cir.1992). The SEC has not yet issued any new determination on the validity of the spin-off.
 
 II. PROCEDURAL HISTORY
 A. The SEC Proceeding
 
 8
 The Public Utility Holding Company Act of 1935, 15 U.S.C. Sec. 79a et seq. (1988 & Supp. V 1993) ("PUHCA"), requires that, before approving an acquisition, the SEC must determine that the transaction "will serve the public interest by tending towards the economical and efficient development of an integrated public-utility system." City of New Orleans v. SEC, 969 F.2d at 1166 (citing 15 U.S.C. Sec. 79j(c)(2)).
 
 
 9
 The SEC originally determined that the Entergy spin-off satisfied PUHCA's statutory requirements and the Commission granted Entergy approval. On appeal, however, this court ruled that in making the spin-off determination, the SEC had not taken into account "the System's increased costs that will result from having to replace the spin-off plants in the future ... [or] ... the fact that System costs will increase because alternative sources of energy available to the System are more expensive than the type used by the spin-off plants." Id. at 1167. Because of that omission, we remanded the case for further development of the administrative record. See id. at 1169.
 
 B. FERC Proceedings
 1. The Commission's Hearing Order
 
 10
 The City of New Orleans filed a complaint with FERC, seeking relief from alleged adverse rate consequences from the transfer of capacity to EPI. In response, FERC set for hearing "the narrow question of whether overall billings will increase under the Entergy System Agreement as a result of the transfer of AP & L's ownership interests in the two units and, if so, whether those higher charges reflect prudently incurred costs which may be reasonably passed through the Entergy System Agreement's formula rates." City of New Orleans v. Entergy Corp., 54 F.E.R.C. p 61,298, at 61,865, reh'g denied, 55 F.E.R.C. p 61,221 (1991).[1]
 
 
 11
 In the same Hearing Order, however, FERC noted that the effect on ratepayers of any eventual replacement costs would depend on several highly speculative factors. Thus, the Commission concluded that it would be premature to decide the prudence question finally until the actual need for replacement capacity arose, and dismissed without prejudice the portion of CNO's complaint requesting investigation into the costs associated with adding future capacity. See id. at 61,865-66.
 
 2. The Commission's Rehearing Order
 
 12
 On rehearing, CNO requested that FERC set for hearing now the issue of these future capacity costs and the prudence of Entergy incurring them. The Commission rejected CNO's position, stating:
 
 
 13
 We remain convinced ... that the issue of whether the existing rate methodologies for reserve sharing (Service Schedule MSS-1) will continue to be reasonable if there are future capacity additions is not ripe for review at this time. Until such time as we know the specifics of the capacity to be added, we cannot determine the effect of an addition on the reasonableness of the existing rate methodologies. Accordingly, we shall deny rehearing on this point.
 
 
 14
 55 F.E.R.C. at 61,729.
 
 
 15
 Nevertheless, the Commission commented that an increase in overall billings, if any, would result from changes in energy costs as well as in capacity costs, and that the parties would not be precluded from litigating the accuracy of cost projections for both of these types of costs.[2] Specifically, FERC clarified that CNO "is not precluded from arguing that Entergy's projections of overall billings under existing rates are inaccurate because Entergy has failed to accurately project the capacity component of the overall billings." Id.
 
 
 16
 Thus, FERC invited testimony regarding the cost of capacity replacement and its effect on billings, at the same time it reasserted the determination that the reasonableness of the existing rate methodologies if such capacity is added cannot yet be determined.
 
 
 17
 3. The Administrative Law Judge's Initial Decisions
 
 
 18
 On March 19, 1992, the presiding administrative law judge ("ALJ") divided the hearing into two phases. Phase I, he determined, would address the question of whether overall billings would increase as a result of the transfer. If Phase I were answered affirmatively, Phase II would involve a determination of whether the billings were reasonable.
 
 Phase I
 
 19
 In the Phase I Initial Decision, the ALJ adopted a ten-year yardstick for the overall billings inquiry and determined that, viewed from both a single-company and a system-wide perspective, the results "are sufficient to demonstrate billings increases [over a 10-year period] for purposes of moving on to the prudence inquiry." City of New Orleans v. Entergy Corp., 59 F.E.R.C. p 63,016, at 65,092. No party filed exception to this finding. See City of New Orleans v. Entergy Corp., 65 FERC p 61,333, at 62,560 (1993).
 
 
 20
 Although the ALJ examined the increase in billings only over a ten-year period, he clarified that the billings phase time frame did not preclude the parties using twenty-year projections in Phase II. 59 F.E.R.C. at 65,092.
 
 Phase II
 
 21
 During the Phase II proceedings, the parties introduced several studies predicting the short- and long-term economic effects of the spin-off. The studies varied in the length of the projections (from ten to thirty years), the costs considered (some took replacement capacity costs into account and some did not), the perspective used (some evaluated gains and losses from the perspective of individual companies and some from the system as a whole), and the conclusions reached (some predicted system detriments and some predicted gains).
 
 
 22
 In the Phase II Initial Decision, the ALJ made several findings: first, he determined that a twenty-year time frame was appropriate for assessing the economic effects of the spin-off, "because it is only then that replacement costs enter the picture." City of New Orleans v. Entergy Corp., 61 F.E.R.C. at 65,007. Second, the ALJ held that the Phase II evaluation should be made from the perspective of the system as a whole; and third, he found that Entergy's decision to make the transfer had been based on flawed decisionmaking, but that the flawed decisionmaking did not matter, since the ultimate result (i.e., the spin-off) was reasonable. Id. at 65,008.
 
 
 23
 The ALJ noted that the testimony suggested that replacement costs would ultimately be even less than Entergy had predicted, and offered this final conclusion: "Complainants have raised serious doubts about the prudence of Entergy's transfer to EPI; however, Entergy has rebutted those doubts. The record shows that the transfer decision was prudent for the System." Id. at 65,020.
 
 
 24
 4. Commission Opinion No. 386. Opinion and Order Affirming in Part and Vacating in Part Initial Decisions
 
 
 25
 In December, 1993, the Commission affirmed in part and vacated in part the Initial Decisions in this matter. 65 F.E.R.C. at 62,568 (1993). FERC found that the studies presented in Phase II had shown that, for the period from 1990 to 1999, the spin-off would harm neither the individual operating companies nor the system as a whole. Therefore, the opinion affirmed the ALJ's determination that the rates were reasonable for the period up until 1999. Id. at 62,566. With respect to the replacement capacity costs, which would only be incurred, if at all, after 1999, the Commission expressly declined to make any prudence determination. The Commission reaffirmed its prior announcements that any evaluation of the reasonableness of rate methodologies with respect to this potential replacement capacity would be premature. Accordingly, the opinion vacated that portion of the Initial Decision which had addressed the issue of replacement capacity costs. Id. at 62,568.
 
 
 26
 In declining to rule on the prudence with respect to replacement capacity, the Commission expressly left the door open for future litigation on this matter, stating that "it follows that Entergy stockholders are not absolved from any potential disallowance in a future proceeding involving the assignment of replacement capacity costs." Id. at 62,566.
 
 
 27
 5. Commission Opinion No. 386-A. Order Denying Rehearing
 
 
 28
 In an Order Denying Rehearing, the Commission reiterated that CNO could file a new complaint "if and when Entergy adds new capacity to its system." City of New Orleans v. Entergy Corp., 66 F.E.R.C. p 61,241, at 61,588 (1994) (Op. No. 386-A).
 
 
 29
 The instant appeal followed.
 
 III. CURRENT PARTIES AND POSITIONS
 
 30
 Three parties are involved in the appeal now before us.
 
 
 31
 Entergy and CNO both argue that FERC's decision not to make a final prudence determination as to the spin-off which would consider replacement capacity costs is unreasonable. Since prudence determinations are to be made on the basis of information available at the time of the transaction, the parties claim, FERC has a duty to rule finally on that aspect of the spin-off now.
 
 
 32
 The consensus between the two challenging parties ends there. Once replacement capacity costs enter the picture, Entergy and CNO would reach opposite prudence findings. Entergy claims that the record shows that the spin-off decision was prudent, even when replacement capacity costs are considered. CNO, on the other hand, alleges that when replacement costs enter the balance, the spin-off becomes imprudent.
 
 
 33
 FERC, naturally, defends its determination not to enter the thorny thicket of downthe-line replacement costs now. The Commission also argues that the case--in which FERC has already issued an initial opinion, a decision affirming in part the initial opinion, and an order denying rehearing--is not appropriate for review until the SEC has issued its remand determination on the validity of the transfer under PUHCA.
 
 IV. DISCUSSION
 A. FERC's "Aggrieved Party" Claim
 
 34
 FERC argues that the petitioners are not yet "aggrieved" parties, claiming that PUHCA's grant of jurisdiction to the SEC to regulate the corporate structure of public utility holding companies makes FERC's jurisdiction in this case contingent on the SEC's currently-pending decision reconsidering its approval of the transfer. Because the SEC's approval of the transfer was remanded, and no subsequent decision has been rendered by that agency, the SEC could still ultimately deny approval of the spin-off, or act in a way so as to "trap costs" that FERC would have no authority to change.
 
 
 35
 We disagree with FERC that the parties are not yet aggrieved.[3] The proposal was initially approved by the SEC and the transfer took place in 1990. Even after this court's remand for reconsideration of the SEC approval, the SEC's original order remains in effect. Section 24 of PUHCA grants a reviewing court jurisdiction "to affirm, modify, or set aside" an order, 15 U.S.C. Sec. 79x(a), but declares that the commencement of proceedings under subsection (a) "shall not, unless specifically ordered by the court, operate as a stay of the Commission's order." 15 U.S.C. Sec. 79x(b). This court issued no such stay.
 
 
 36
 The challenging parties assert that the transfer will aggrieve them eventually in the form of unreasonable rates, and so was not prudently entered into. If they are correct, as we must assume them to be for purposes of determining their aggrievement, they had a right to a review of FERC's decision on the prudence of the transaction in terms of its effect on ratepayers. Furthermore, it is difficult to conjecture how any later decision of the SEC could conflict with this FERC decision. In the event that the SEC approves the transfer, FERC's deferral of a prudence determination on second-decade replacement costs poses no conflict with that decision, and in the event of an SEC rejection, the transfer would be vacated and FERC's decision mooted.
 
 
 37
 To support their aggrievement argument, FERC relies on the Ohio Power decisions of this circuit and the Supreme Court, which address the relationship between FERC and the SEC, and the applicability of Sec. 318 of the Federal Power Act ("FPA"), 16 U.S.C. Sec. 825q (1988), which regulates conflicts between the agencies' statutory mandates.[4] The PUHCA/FPA statutory scheme clearly envisions concurrent jurisdiction by FERC and the SEC, rather than the "contingent jurisdiction" FERC claims. We recognized this concurrent jurisdiction in City of Holyoke Gas & Elec. Dep't v. SEC, 972 F.2d 358 (D.C.Cir.1992), where we noted that the SEC "may not rely upon FERC's concurrent jurisdiction over an acquisition as a reason to shirk its own statutory mandate." Id. at 363. We now recognize the converse proposition, that FERC cannot shirk its own duty on these same grounds.
 
 
 38
 In drafting the FPA, Congress foresaw that PUHCA's requirement that the SEC regulate corporate structure and the FPA's requirement that FERC regulate utility rates could conflict, and provided for that possibility. When the two agencies' mandates directly clash, Sec. 318 of the FPA states that the SEC's determinations will prevail.
 
 
 39
 The Ohio Power decisions explain this court's interpretation of the relationship between the SEC and FERC, as governed by the statute. In Ohio Power Co. v. FERC, 880 F.2d 1400 (D.C.Cir.1989) (Ohio Power I ), rev'd sub nom. Arcadia v. Ohio Power Co., 498 U.S. 73, 111 S.Ct. 415, 112 L.Ed.2d 374 (1990), this court determined that Sec. 318 governed a petition by a power company to vacate a FERC order finding that the company's cost of coal purchased from an associated company was unreasonable. The power company rested its claim on the grounds that the SEC (which had jurisdiction over the coal transactions under Sec. 13(b) of PUHCA because both companies were associates of a public utility holding company) had ordered that "[t]he price at which ... [the] coal is sold ... will not exceed the cost thereof to the seller." Id. at 1404. This court agreed with the petitioners that the two agencies had ruled in an inconsistent manner upon the same subject matter, and held that Sec. 318 mandated that the reasonableness of the sales contract for the "captive coal" was to be resolved by the SEC rather than FERC. Id. at 1409.
 
 
 40
 On appeal, the Supreme Court disagreed, holding in Arcadia v. Ohio Power Co., 498 U.S. 73, 111 S.Ct. 415, 112 L.Ed.2d 374 (1990), that Sec. 318 did not govern this dispute. Even if FERC's order had dealt with a subject matter cognizable under Sec. 318, the Court found that the two agencies had not ruled inconsistently on the same subject matter. Id. at 85, 111 S.Ct. at 422. The Court left the lower court to resolve whether FERC had violated its own regulation and whether FERC had "trapped" costs which the SEC had approved. Id.
 
 
 41
 In this case, similarly, we find no inter-agency conflict cognizable under Sec. 318. The SEC has authority only to approve the sale of the generating facilities; FERC has authority only to judge the reasonableness of the transfer's effect on power rates. The two agencies' responsibilities do not overlap. Thus, any reliance by FERC on Sec. 318 is misplaced.
 
 
 42
 Alternately, the Commission argues that our decision in Ohio Power on remand limits FERC's authority to rule on the merits of CNO and Entergy's complaints. Ohio Power v. FERC, 954 F.2d 779 (D.C.Cir.) (Ohio Power II ), cert. denied sub nom. Arcadia v. Ohio Power Co., --- U.S. ----, 113 S.Ct. 483, 121 L.Ed.2d 388 (1992). In Ohio Power II, this court held that FERC's authority to review the reasonableness of rates under the FPA had been constrained by PUHCA's grant of power to the SEC to approve the price of interassociate sales of goods. See id. at 784. The court held that FERC could not declare unreasonable a price that had been expressly approved by the SEC: "FERC may not set a cost-trapping rate level where that effect is occasioned by a recovery calculation inconsistent with an SEC determination governing an inter-associate transfer subject to Sec. 13(b) of the PUHCA." Id. at 786.[5]
 
 
 43
 There is no comparable cost-trapping problem here. First, there is no indication in the record that the SEC is even considering approving a sales price for the Entergy electricity. More conclusively, though, FERC's order deferring a prudence determination, which does not declare any price unreasonable, could not possibly "trap" costs, even if those costs were approved by the SEC.
 
 B. The Merits of Petitioners' Claims
 Replacement Capacity Costs
 
 44
 The most significant dispute in this case concerns the question whether or not FERC must consider projected replacement capacity costs when making a determination of the "prudence" of the spin-off with respect to rates.
 
 
 45
 Section 205(a) of the FPA provides that all rates and charges made by a public utility must be "just and reasonable." To determine reasonableness, FERC applies a "prudence" test, which permits utilities to recover in their rates the cost of "prudent" investments. This test is laid out most clearly in New England Power Co., 31 F.E.R.C. p 61,047 (1985), aff'd sub nom. Violet v. FERC, 800 F.2d 280 (1st Cir.1986) ("Violet"):
 
 
 46
 [M]anagers of a utility have broad discretion in conducting their business affairs and in incurring costs necessary to provide services to their customers. In performing our duty to determine the prudence of specific costs, the appropriate test to be used is whether they are costs which a reasonable utility management (or that of another jurisdictional entity) would have made, in good faith, under the same circumstances, and at the relevant point in time.
 
 
 47
 Id. at 61,084.
 
 
 48
 The petitioners correctly point out that a prudence analysis must evaluate a utility's decision on the basis of information available to the utility at the time the decision is made. Neither FERC nor this court can properly use hindsight in evaluating the reasonableness of a decision's effect on rates. See id. ("We note that while in hindsight it may be clear that a management decision is wrong, our task is to review the prudence of the utility's actions and the costs resulting therefrom based on the particular circumstances existing at the time the challenged costs were actually incurred, or the time the utility became committed to incur those expenses."). Nevertheless, we reject petitioners' contention that the ban on the use of hindsight necessarily requires FERC to make a final decision at this juncture as to the prudence of the spin-off with respect to replacement capacity costs in the distant future.
 
 
 49
 We also reject petitioners' claim that our decision in City of New Orleans v. SEC requires that we remand for FERC to consider replacement costs in its prudence analysis. In that case, we objected to the agency's reliance on an unsatisfactory report submitted by Entergy, which claimed that the benefits of the spin-off outweighed the costs. We pointed out that the Entergy study had considered the total capacity of the System in drawing its conclusions regarding replacement costs, but had stated its conclusions regarding savings in terms of the advantage to AP & L ratepayers only. We also noted that "the Commission made no further effort to explain how replacement costs would affect other System utilities' ratepayers." 969 F.2d at 1167. It was primarily this analytical imbalance, which the SEC failed to address, that led to our remand. CNO mistakenly interprets our opinion, however, to hold that we remanded because the SEC had failed to consider replacement costs. In fact, we explained that we were remanding because the SEC had "failed to address directly the effect of plant replacement costs on the petitioners [CNO et al ]." Id. at 1169 (emphasis added). We believe the opinion is clear that a critical issue in City of New Orleans v. SEC was the nonrecognition of "the costs borne by non-Arkansas ratepayers," id. at 1167, rather than the consideration of replacement costs, per se. Accordingly, we do not find this case controlling as to the FERC's duty to consider its replacement costs in any determination of the effect of the transfer upon ratepayers in the short- and long-term haul.
 
 
 50
 Without passing on the wisdom of FERC's decision to delay consideration of the replacement costs, we hold that for purposes of this case, nothing in the FPA or in the caselaw compels the Commission to include those costs in the current prudence inquiry. Nor is FERC's decision to defer this issue clearly contrary to its own precedent. Thus, the question rested securely within the agency's discretion and therefore deserves deference.
 
 
 51
 The Commission determined that it would not review the replacement costs issue until such time as the System actually adds capacity. Not until that time can the replacement costs have any effect, let alone an unreasonable one, on the utility's rates. This decision comports with FERC precedent suggesting that a prudence inquiry is proper only after a decision affects jurisdictional rates. See Duke Power Co., 46 F.E.R.C. p 61,315, at 61,962 (1989); Minnesota Power & Light, 43 F.E.R.C. p 61,104, at 61,343 (1988). FERC has determined that in this case the effect of replacement costs on ratepayers will depend on several highly speculative variables: (1) the configuration of future capacity additions, (2) the relationship between long and short companies at the time, and (3) the then-existing version of the System Agreement. 54 F.E.R.C. at 61,865-66. Given these variables, FERC suggests the possibility that capacity additions might not affect billings at all. See id. at 61,866 n. 15.
 
 
 52
 Entergy complains that FERC's opinion leaves open the possibility that ratepayers can ultimately challenge the prudence of today's spin-off with the advantage of hindsight. Until the final prudence determination is made, Entergy must operate under a cloud that may deter investors. If so, that risk must be accepted as a tolerable incident of utility regulation. FERC has already explained in prior cases that postponing a prudence analysis until the rate-altering event occurs does not conflict with the duty to utilize the knowledge available at the time the decision was made. In Minnesota Power & Light, FERC denied a request to make a prudence finding regarding speculative future costs, but nevertheless promised that, when the issue eventually became ripe, the Commission would ask what a prudent utility would have done at the time of the action:
 
 
 53
 A utility whose actions were prudent when made runs no risk as a result of the Commission's declining to make an advance determination as to the prudence of its actions. On the other hand, advance prudence determinations pose the risk that the Commission will become involved in day-to-day utility management decisions.... In accordance with Commission precedent, any inquiry as to the prudence of the utilities' decisions should occur at such time as the companies actually seek to reflect the effect of the proposed transactions in rates.
 
 
 54
 43 F.E.R.C. at 61,343.
 
 
 55
 We note, additionally, that the FERC Order in this case explicitly states that "Entergy stockholders are not absolved from any potential disallowance in a future proceeding involving the assignment of replacement capacity costs." 65 F.E.R.C. at 62,566. Therefore, FERC remains obligated to address the prudence of replacement capacity costs when and if they are actually incurred.
 
 
 56
 In sum, FERC's decision to defer the issue of replacement costs is a reasonable one, and we affirm the Commission's Order. Accordingly, we need not address the dispute between CNO and Entergy about whether FERC should find those costs prudently incurred if it did consider them. As to the question of whether Entergy engaged in faulty decisionmaking, we agree with the ALJ and the Commission that since the overall effect of the spin-off on ratepayers was reasonable, any flaws in Entergy's decisionmaking process were irrelevant.[6]
 
 
 57
 So ordered.
 
 
 
 [1]
 For a discussion of the prudence standard, see Part IV.B, infra
 
 
 [2]
 CNO claims that the transfer will cause the System to use more expensive sources of energy for intracompany transactions under the Entergy System Agreement ("energy costs") and that the System will have to add capacity to the system sooner than planned to make up for the lost capacity ("capacity costs"). See 54 F.E.R.C. at 61,865
 
 
 [3]
 The cases FERC cites to back their "aggrievement" claim all address the reviewability of nonfinal agency orders, and thus are inapplicable in a case in which the Commission has issued a final order on the merits of the controversy, as well as an order denying rehearing. See Papago Tribal Utility Authority v. FERC, 628 F.2d 235, 236 (D.C.Cir.) (addressing the reviewability of "certain nonfinal administrative orders"), cert. denied, 449 U.S. 1061, 101 S.Ct. 784, 66 L.Ed.2d 604 (1980); see also Kokajko v. FERC, 837 F.2d 524, 525 (1st Cir.1988) (addressing a claim on which "FERC has not yet issued a ruling on the merits"); Public Service Co. of N.M. v. FPC, 557 F.2d 227 (10th Cir.1977) (involving a "preliminary" and "procedural" motion); Niagara Mohawk Power Corp. v. FPC, 538 F.2d 966 (2d Cir.1977) (involving an order denying a motion to dismiss)
 
 
 [4]
 Section 318 of the FPA states:
 Conflict of jurisdiction. If, with respect to the issue, sale, or guaranty of a security, or assumption of obligation or liability in respect of a security, the method of keeping accounts, the filing of reports, or the acquisition or disposition of any security, capital assets, facilities, or any other subject matter, any person is subject both to a requirement of the Public Utilities Holding Company Act of 1935 [15 U.S.C. 79 et seq.] or of a rule, regulation, or order thereunder and to a requirement of this chapter or of a rule, regulation, or order thereunder, the requirement of the Public Utility Holding Company Act of 1935 shall apply to such person, and such person shall not be subject to the requirement of this chapter, or any rule, regulation, or order thereunder, with respect to the same subject matter, unless the Securities and Exchange Commission has exempted such person from such requirement of the Public Utility Holding Company Act of 1935, in which case the requirements of this chapter shall apply to such person.
 16 U.S.C. Sec. 825q.
 
 
 [5]
 We also found that FERC had violated its own regulation, which provided that the price of fuel purchased from an affiliate would be deemed reasonable where it is subject to the jurisdiction of a regulatory body. Id. at 783-84
 
 
 [6]
 CNO also requested that FERC grant hold-harmless relief, which would insulate New Orleans ratepayers from increased costs due to the spin-off. Because the Commission's decision, which we affirm, finds the transfer prudent until replacement capacity is added and leaves open the possibility that the transfer will eventually be declared prudent in all respects (including with regard to replacement capacity), and because prudently-incurred costs can properly be passed through to ratepayers, we agree with FERC's denial of the requested relief