**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

VERIZON CALIFORNIA INC.,
    *Plaintiff-Appellant,*

    v.

MICHAEL R. PEEVEY; LORETTA M.
LYNCH; CARL W. WOOD; GEOFFREY
F. BROWN; SUSAN P. KENNEDY, in
their official capacities as
Commissioners of the Public
Utilities Commission of the State
of California, and not as
individuals,
    *Defendants-Appellees,*

AT&T COMMUNICATIONS OF
CALIFORNIA INC.; MCI WORLDCOM
COMMUNICATIONS, INC.; MCIMETRO
ACCESS TRANSMISSION SERVICES,
LLC,
    *Defendants-Intervenors-*
        *Appellees.*

No. 04-15155

D.C. No.
CV-03-02838-THE

OPINION

Appeal from the United States District Court
for the Northern District of California
Thelton E. Henderson, District Judge, Presiding

Argued and Submitted
January 12, 2005—San Francisco, California

Filed July 6, 2005

Before: John T. Noonan, Carlos T. Bea, Circuit Judges, and
Robert E. Jones, District Judge.*

*The Honorable Robert E. Jones, Senior United States District Judge
for the District of Oregon, sitting by designation.

Opinion by Judge Noonan;
Concurrence by Judge Bea

## COUNSEL

Henry Weissmann, Burton A. Gross, John P. Hunt and Rose-marie T. Ring, Munger, Tolles & Olson LLP, Los Angeles, California, for plaintiff-appellant Verizon California Inc.

Randolph L. Wu, Mary F. McKenzie and Kimberly J. Lippi, San Francisco, California, for defendants-appellees Michael R. Peevey, Loretta M. Lynch, Carl W. Wood, Geoffrey F. Brown and Susan P. Kennedy in their official capacities as Commissioners of the Public Utilities Commission of the State of California.

Catherine M. Barrad and Randolph W. Deutsch, Sidley, Austin, Brown & Wood LLP, San Francisco, California, and David J. Miller, AT&T Communications of California, Inc., San Francisco, California, for intervenor/defendant-appellee AT&T Communications of California, Inc.

Donald B. Verrilli, Jr., Michael B. DeSanctis and Daniel Mach, Jenner & Block LLP, Washington, D.C., and Jeffrey A. Rackow, MCI, Inc., Washington, D.C., for intervenors/defendants-appellees MCI WorldCom Communications, Inc. and MCIMetro Access Transmission Services LLC.

## OPINION

NOONAN, Circuit Judge:

We must decide whether an incumbent local exchange carrier's challenge to nominally "interim" rates for access to its network by competitive local exchange carriers, which rates are set by a state utilities commission pursuant to the Telecommunications Act of 1996, is ripe for judicial review, even though such rates are subject to later adjustment by the state utilities commission ("a true-up"). When the incumbent local

exchange carrier has cognizable claims which cannot and will not be compensated by the true-up, we hold such challenge is ripe for judicial review.

## BACKGROUND

The Telecommunications Act of 1996 ("the Act"), Pub. L. No. 104-104, 110 Stat. 56 (codified as amended in scattered sections of 47 U.S.C.) aims in part to introduce competition among local exchange carriers. *Verizon Communs., Inc.* v. *FCC*, 535 U.S. 467, 476-77 (2002). A "local exchange" is "a network connecting terminals like telephones, faxes, and modems to other terminals within a geographical area like a city." 535 U.S. at 489. The Act recognizes two types of local exchange carriers. An "incumbent local exchange carrier" ("ILEC") is a carrier that owns a local exchange. *Id.* at 490 (citing 47 U.S.C. § 251(h)). A "competitive local exchange carrier" ("CLEC") is a carrier new to the market, without a local exchange of its own. *See* 535 U.S. at 491-92. Absent regulation, "[a] newcomer could not compete with the incumbent carrier to provide local service without coming close to replicating the incumbent's entire existing network [or local exchange] . . . ." *Id.* at 490.

To foster competition, the Act requires that ILECs make available to CLECs "access" to the ILECs' "network elements" "on an unbundled basis." 47 U.S.C. § 251(c)(3). A "network element" is "a facility or equipment used in the provision of a telecommunications service" or those "features, functions, and capabilities that are provided by means of such facility or equipment, including subscriber numbers, databases, signaling systems, and information sufficient for billing and collection or used in the transmission, routing, or other provision of a telecommunications service." 47 U.S.C. § 153(29). To provide "access" to a network element "on an unbundled basis" — or, said differently, to provide access to unbundled network elements ("UNEs") — "is to lease the element, however described, to a requesting carrier at a stated

price specific to that element" without requiring that other elements also be leased ("bundled"). *See Verizon Communs., Inc.*, 535 U.S. at 531.

Pursuant to the Act, CLECs requesting access to UNEs are first to attempt to negotiate rates for such access with the ILEC that owns the network. 47 U.S.C. §§ 251(c)(1), 252(a)(1). If the parties successfully negotiate rates, the relevant state utilities commission is required to accept those rates unless they discriminate against a carrier not a party to the contract, or the rates are otherwise shown to be contrary to the public interest. 47 U.S.C. §§ 252(e)(1), (e)(2)(A). If the parties cannot agree on rates, any party to the negotiations may request arbitration to be conducted by the relevant state utilities commission. 47 U.S.C. § 252(b)(1).

The Act assumes that a state utilities commission may refuse or otherwise fail to conduct the arbitration, in which case the Act provides that the Federal Communications Commission ("FCC") shall act in the place and stead of the state utilities commission. *See* 47 U.S.C. § 252(e)(5). However, where, as here, the state utilities commission conducts the arbitration, such commission is bound by the Act's provisions governing how the rates must be set and by the FCC's related regulations, 47 U.S.C. § 252(c)(1)-(2), including regulations that require state utilities commissions to use the total element long run incremental cost ("TELRIC") methodology. 47 C.F.R. § 51.505; *see also AT&T Corp.* v. *Iowa Utils. Bd.*, 525 U.S. 366, 385 (1999) (upholding the FCC's jurisdiction to design a pricing methodology to bind state utilities commissions); *Verizon Communs., Inc.*, 535 U.S. at 497-528 (upholding the TELRIC regulations in particular). It is important to note that, in setting forth these requirements, neither the Act nor the FCC regulations distinguishes between "interim" rates and "final" rates. *Cf. AT&T Communs. of Ill., Inc.* v. *Ill. Bell Tel. Co.*, 349 F.3d 402, 411 (7th Cir. 2003) ("[T]he possibility of repair in the future is no warrant for promulgating today a rate that deviates from the TELRIC standard. Federal law

requires that *any* rate for unbundled network elements, adopted by a state commission, comply with TELRIC when adopted.") (emphasis added).

In 1997, the California Public Utilities Commission ("CPUC") established nominally interim rates for access by CLECs to Verizon's UNEs. We characterize these rates as interim only in name because, for reasons not relevant here, the CPUC did not undertake the task of setting permanent rates until 2002. Even then, it did not set permanent rates, but rather held expedited proceedings to establish revised interim rates, which were to remain in effect until permanent rates could be established. After receiving several interim rate proposals from Verizon and interested CLECs, the CPUC issued the interim rate order that is at issue in this appeal. 2003 Cal. PUC LEXIS 168 (Cal. Pub. Util. Mar. 13, 2003). In brief, the revised interim rates were based on rates approved by the utilities commission in New Jersey, where Verizon also is the ILEC; the rates were adjusted in an effort to reflect Verizon's higher costs in California relative to New Jersey. *Id.* at *109-10. Verizon alleges both that the methodology used to set the New Jersey rates does not comply with TELRIC as previously interpreted both by the FCC and CPUC, Compl. ¶¶ 36, 39, 42, and that "costs, network requirements, geography, demand levels, and other unique features [relevant to the setting of rates] may differ significantly by state . . . ." Verizon Compl. ¶¶ 35, 42-43. However, in an attempt to remedy these admitted problems, the CPUC made the interim rates subject to a "true-up" when the permanent rates finally were adopted. 2003 Cal. PUC LEXIS at *110. A "true-up" is a determination by the CPUC which adjusts the interim rates, either up or down, as of the earlier effective date of the interim rate order, so that the adjusted interim rates equal the permanent rates as set later in the permanent rate proceeding.

The impact of the interim rate order entered March 13, 2003 was immediately to reduce the rates that Verizon could charge CLECs for access to its UNEs relative to what it had

been able to charge under the earlier rate order. After the CPUC denied Verizon's application for rehearing, Verizon brought an action in federal district court against Michael R. Peevey and other commissioners of the CPUC in their official capacities, in which Verizon alleged five claims: (1) that the interim rate order was arbitrary and capricious and not supported by substantial evidence; (2) that the interim rate order was not in compliance with the Act nor with the regulations implementing the TELRIC methodology; (3) that the interim rate order was confiscatory; (4) that the interim rate order was in violation of due process; and (5) that the interim rate order was in violation of Verizon's civil rights. Verizon sought to have the interim rate order declared unlawful and vacated, to have its enforcement enjoined, and to have the matter returned to the CPUC for further proceedings. Verizon also sought its costs and attorneys' fees incurred in litigating the suit.

AT&T Communications of California, Inc., MCI World-Com Communications, Inc., and MCIMetro Access Transmission Services LLC intervened in the suit, after which Verizon filed a motion for partial summary judgment as to its first, second and fourth claims. However, concluding that Verizon's first and second claims were not ripe for judicial review, the district court denied Verizon's motion for partial summary judgment as to those two claims without reaching their merits, and *sua sponte* dismissed the same two claims. Then, after giving Verizon an opportunity to offer some material basis upon which to distinguish its remaining three claims, the district court dismissed those claims also for lack of ripeness. Verizon appealed the dismissal of its complaint. We have jurisdiction pursuant to 47 U.S.C. § 252(e)(6) and 28 U.S.C. § 1291, and vacate and remand with instructions that the district court consider on the merits whether Verizon is entitled to the declaratory and injunctive relief.

## STANDARD OF REVIEW

We review de novo whether claims are ripe for judicial review. *Laub* v. *United States Dep't of the Interior*, 342 F.3d 1080, 1084 (9th Cir. 2003).

## ANALYSIS

**[1]** The Telecommunications Act of 1996 provides a single methodology for the setting of rates: TELRIC. "Federal law requires that any rate for unbundled network elements, adopted by a state commission, comply with TELRIC when adopted." *AT&T Communs.*, 349 F.3d at 411. No provision is made by this law for any rate to be established in a different way. Verizon alleged that the CPUC had failed to comply. The issue was ready for judicial decision.

**[2]** This obvious result has been clouded by our decision in *US West Communs. v. MFS Intelenet, Inc.*, 193 F.3d 1112 (9th Cir. 1999), understandably treated as precedent by the district court. In *US West* the contention was made and accepted by both parties that the rates were "interim only and may be adjusted by later pricing proceedings." *Id.* at 1118. But neither the legitimacy of interim rates nor possible adjustment by later pricing proceedings (a so-called true-up) is accepted by Verizon. As neither interim rates nor a true-up compensating for such costs as credit insurance are covered by TELRIC, we see no reason to import into this case the assumptions and admissions that were decisive in *US West*.

**[3]** Verizon has presented a straightforward challenge to the basis on which the CPUC set the current rates; namely the rates set in New Jersey, with alleged inadequate adjustment for Verizon's costs in California. Whether this short cut complied with federal law and the constitution is ripe for adjudication.

**[4]** Accordingly, the judgment of the district court is VACATED and the case is REMANDED.

---

BEA, Circuit Judge, concurring:

Although I join in the majority's holding and its conclusion that Verizon's claims are ripe for judicial review, I do not find

its distinction of *US West Communications* v. *MFS Intelenet*, 193 F.3d 1112 (9th Cir. 1999), to be compelling. I nevertheless find *US West* to be distinguishable on a different basis, and take this opportunity to articulate that basis and also to respond to the many arguments advanced by the CPUC and intervenors in support of their view that Verizon's claims are not ripe for judicial review even independent of *US West*.

## I. *US West Communications* v. *MFS Intelenet, Inc.*

The majority distinguishes *US West* on the basis that "neither the legitimacy of interim rates nor possible adjustment by later pricing proceedings (a so-called true up) is accepted by Verizon," slip op. at 7841, suggesting that, by contrast, US West did not contest "the legitimacy of interim rates." I take this to mean that, according to the majority's reading, US West did not contest the legitimacy of rates that, by virtue of being interim, need not be in compliance with the Act so long as US West was later made whole.

With this I do not agree. As we explained there, "US West challenge[d] several of the pricing provisions as inconsistent with the pricing standards fixed by the Act." *Id.* at 1117-18. We nevertheless concluded that the claims were not ripe for judicial review primarily because US West conceded that the true-up would make it whole and, thus, might moot the appeal. *Id.* at 1118-19. This does not mean that US West did not contest the legitimacy of such interim rates. Indeed, we expressly said otherwise:

> *US West challenges the interim rates*, but says its concerns would be resolved if TCG and MFS were ordered to compensate U.S. West for any differences between the interim rates and the permanent prices, referred to as an "administrative true-up."
>
> . . . . Accordingly, we avoid unnecessary adjudication by declining to review the interim prices now.

> If a true-up is ordered, this appeal might become moot, as U.S. West has indicated it would be satisfied with such an order.

*Id.* at 1118-19 (emphasis added).

Thus, I find *US West* distinguishable from the case here not because US West did or did not contest the legitimacy of interim rates that do not comply with the Act and TELRIC methodology, but because it conceded that a true-up would make it whole whereas, by contrast, Verizon has made no similar concession. To the contrary, as I address more fully in Part II.B.1 below, Verizon has affirmatively alleged that the true-up will not make it whole in two different respects: (1) the loss of retail customers suffered during the period until permanent rates are established, which loss is claimed to be due to unlawfully low interim rates; and (2) the credit risk of nonpayment by CLECs of the difference between the rates as set by the interim rate order and as ultimately adjusted by the true-up, a risk Verizon has been and is presently forced to bear. Further, the CPUC *agrees* that these two elements of loss claimed by Verizon will not be considered in the true-up. Thus, to the extent that the district court here was obliged to accept Verizon's allegations of uncompensable losses as true, an issue which I address in Part II.B.3 below, contrary to what was conceded in *US West*, any future true-up here cannot moot this appeal.

Nor is there any merit in the argument of the CPUC and the intervenors that our rationale in *US West* applies here with even greater force than it did there because the true-up here is more certain to occur than it was in *US West*. Presumably the argument is that even in *US West*, we denied review where there was a possibility that US West would suffer losses that would not be compensated if, ultimately, the state utilities commission decided not to order a true-up. But here, to the extent Verizon's allegations must be taken as true, Verizon has suffered, is suffering and will continue to suffer losses

uncompensable by a true-up; it is not a mere possibility. At the procedural phase in which we find ourselves and given Verizon's allegations, it must be deemed a certainty.

Finally, as alluded to above, the possibility that the appeal would be mooted was not the sole ground on which we relied in holding that the claims raised in *US West* were not ripe for judicial review. Rather, as we stated:

> Even if the appeal does not become moot, either because the true-up is denied or because [the CLECs] appeal[ ] the award of a true-up, this court will benefit from the Commission's and the district court's legal analysis of whether a true-up is authorized by the Act and from their assessment of whether it should be imposed in these particular cases.

*Id.* at 1119. This rationale is inapplicable here because none of the parties are contesting whether a true-up is authorized nor whether it should be imposed here. It is admitted by all: The CPUC made the interim rates subject to a true-up, 2003 Cal. PUC LEXIS 168, at *110 (Cal. Pub. Util. Mar. 13, 2003); there will be a true-up.

In short, absent even the remotest possibility that Verizon's claimed losses will be compensated through a true-up (assuming Verizon's allegations to be true) thereby rendering this appeal moot, and in the absence of any suggestion that the parties intend to challenge the propriety of conducting a true-up either generally or as applied here, *US West* does not bind us. *See Hart* v. *Massanari*, 266 F.3d 1155, 1170 (9th Cir. 2001) ("In determining whether it is bound by an earlier decision, a court considers . . . the 'reason and spirit of cases' [and] also 'the letter of particular precedents.' This includes not only the rule announced, but also the facts giving rise to the dispute . . . .") (citation omitted).

## II. Ripeness

Having so distinguished *US West*, I would consider whether the ripeness doctrine nevertheless bars Verizon's action. The ripeness doctrine at issue here was first set forth in *Abbott Laboratories* v. *Gardner*, 387 U.S. 136, 153 (1967), and is a prudential, rather than jurisdictional, doctrine. *National Audubon Society, Inc.* v. *Davis*, 307 F.3d 835, 850 (9th Cir. 2002), *as amended by*, 312 F.3d 416 (9th Cir. 2002). It requires that "[i]n considering whether a case [challenging administrative action] is ripe for review, a court must evaluate [1] the fitness of the issues for judicial decision and [2] the hardship to the parties of withholding court consideration." *US West*, 193 F.3d at 1118 (quoting *Winter* v. *California Medical Review, Inc.*, 900 F.2d 1322, 1325 (9th Cir. 1990) (quoting *Abbott Laboratories*, 387 U.S. at 149)) (internal quotation marks omitted). "A claim is fit for decision if the issues raised are primarily legal, do not require further factual development, and the challenged action is final." *Id.* (quoting *Standard Alaska Production Co.* v. *Schaible*, 874 F.2d 624, 627 (9th Cir. 1989)) (internal quotation marks omitted). "To meet the hardship requirement, a litigant must show that withholding review would result in direct and immediate hardship and would entail more than possible financial loss." *Id.* (quoting *Winter*, 900 F.2d at 1325) (internal quotation marks omitted).

### A. The Fitness of the Issues for Judicial Decision

#### 1. The Issues Raised Here Are Primarily Legal and Do Not Require Further Factual Development

The requirements that the issues raised be primarily legal and not require further factual development are, in fact, the same. "[A] controversy is 'essentially legal in nature' . . . when no 'further factual amplification is necessary.' " *City of Auburn* v. *Qwest Corp.*, 260 F.3d 1160, 1172 (9th Cir. 2001) (quoting *Western Oil & Gas Association* v. *Sonoma County*, 905 F.2d 1287, 1291 (9th Cir. 1990)). Verizon's claims

require analysis only of the administrative record so that the court can determine whether the rates already imposed — whether interim or final — comply with the Act and relevant regulations, including the TELRIC methodology. *See Fox Television Stations, Inc.* v. *Federal Communications Commission*, 280 F.3d 1027, 1039 (D.C. Cir. 2002) (holding that "whether the Commission's determination [regarding certain 'ownership rules'] was arbitrary and capricious or contrary to law" was a "purely legal" question). Thus, the claims require no further factual development and are primarily legal.

## 2. The Challenged Action Is Final

Whether a challenged action is sufficiently "final" for judicial review depends on whether it is the sort of action which federal courts have jurisdiction to review. Under the Act, "[i]n any case in which a State commission makes *a determination* under [47 U.S.C. § 252], any party aggrieved by *such determination* may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of [47 U.S.C. § 251] and [47 U.S.C. § 252]." 47 U.S.C. § 252(e)(6) (emphases added). We previously have had occasion to define "a determination" for purposes of 47 U.S.C. § 252(e)(6) in the context of holding that a utility need not exhaust available state remedies before seeking judicial review in federal court of a final rate order set by the CPUC. *AT&T Communications Systems* v. *Pacific Bell*, 203 F.3d 1183, 1184 (9th Cir. 2000). In so doing, we expressly distinguished the judicial review provision in the Act from that in the Administrative Procedure Act ("APA"), noting that whereas the APA "authorizes review only of 'final agency action,' 5 U.S.C. § 704, section 252 does not provide that there must be a 'final' determination after exhaustion of all available remedies." *Id.* Rather, we explained, "[i]t requires only that there be 'a determination,' " and, thus, we held that "[a] state commission's decision can be 'a determination' *even if it is subject to a request for rehearing so long*

*as the decision is operational or binding on the parties in the absence of a request for rehearing.*" *Id.* (emphasis added).

At least to the extent Verizon's allegations of uncompensable harm are accepted as true, the interim rate order here is both operative and binding on Verizon. The order was entered on and effective as of March 13, 2003. 2003 Cal. PUC LEXIS 168, at *117. If Verizon refuses to comply, it faces substantial penalties. Cal. Pub. Util. Code §§ 2107-08 (providing for a penalty of as much as $20,000 for "each offense" and providing that "in case of a continuing violation each day's continuance thereof shall be a separate and distinct offense"). And although the interim rates may be subject to a true-up, the losses that are alleged to result from the operation of the rates today are alleged to be uncompensable by means of the true-up.

The CPUC and the intervenors, however, attempt to distinguish *AT&T Communications Systems* on the grounds that the question there was whether exhaustion of state remedies was required and that the rates challenged there were final rather than interim. Admittedly, we faced a different question in *AT&T Communications Systems* than we face here. But, as I began my analysis, whether a challenged action is sufficiently "final" for judicial review depends on whether it is the sort of action which federal courts have jurisdiction to review. The Act authorizes judicial review for "determination[s]" by state commissions, 47 U.S.C. § 252(e)(6), and I see no reason why we should define the statutory term differently for purposes of the ripeness doctrine than we did for purposes of the exhaustion doctrine.[1]

---

[1]Indeed, we recently explained that the ripeness doctrine as it pertains to "cases involving administrative agencies . . . recognize[s] that judicial action should be restrained when other political branches have acted or will act," *Principal Life Insurance Co.* v. *Robinson*, 394 F.3d 665, 670 (9th Cir. 2004), and that "[p]rinciples of federalism lend this doctrine additional force when a federal court is reviewing a state agency decision at an interim stage in an evolving process." *US West*, 193 F.3d at 1118. Both of these rationale are not unlike those underlying the exhaustion doctrine.

Further, the CPUC and the intervenors' emphasis on the fact that the rates here are nominally interim rather than final is misplaced for at least three reasons. *First*, Verizon's argument today is not with the final rates. Even if the final rates fully comply with the TELRIC methodology and even with the ensuing true-up, Verizon would still mount the same challenge to the interim rates that it makes today. Thus, neither its claims, nor the CPUC's nor the intervenors' defenses, would differ if they were to litigate after the final rates are promulgated.

*Second*, the assumption that interim rates are substantially more fleeting than final rates and, thus, that there is or should be something fundamentally different about the way in which interim rates are or are not reviewed, is belied by the facts. The interim rates here have already been in effect for more than two years, and we are informed that although permanent rates *may* be set this year, they could be set as late as next year. By comparison, final rates that "are set by state commissions" are "usually" done so pursuant to "arbitrated agreements with [only] *3- or 4-year terms*," *Verizon Communications Inc.* v. *Federal Communications Commission*, 535 U.S. 467, 505 (2002) (emphasis added), and likely change thereafter.

*Third*, the CPUC and the intervenors' position largely boils down to the indefensible proposition that a state commission can insulate its "determination[s]" from judicial review by labeling them "interim." This would eviscerate the judicial review provided by statute and cannot be, particularly in light of the fact that, as the history of this case demonstrates, so-called interim rates can remain in effect for years, command immediate compliance on pain of sanctions, and can allegedly cause losses which are, and will be, uncompensable.

Recognizing this potential for abuse, the CPUC concedes that particularly arbitrary rates should be subject to judicial review even if interim. *See*, *e.g.*, CPUC Br. at 19-20; Jan. 21,

2005 Oral Arg. at 00:37:37 - 00:38:09. Although the degree of arbitrariness of an interim rate may render it more or less in *need* of judicial review, it does not render an interim rate more or less "a determination" and, thus, *fit* for judicial review.

The CPUC also defends its position by arguing that interim and unreviewable rates are useful regulatory tools in that they permit the CPUC to set rates relatively quickly, without the considerable delay and expense of procuring and reviewing cost studies and holding full hearings. Hence, argues the CPUC, such rates better effect the purpose of the Act, which is to promote competition among local exchange carriers. The CPUC's assumption, however, that absent its rate setting there will be no competition, is in error. To begin, even before the interim rate order at issue here, Verizon already was making its network available to competitors under rates set by the CPUC. Further, even absent such a circumstance, an ILEC and CLECs are always free to negotiate rates.[2] If they cannot agree on rates, and the CPUC is without the resources to set rates in a timely fashion, it can defer to the determinant power of the FCC. *See* 47 U.S.C. § 252(e)(5) ("If a State commission fails to act to carry out its responsibility under this section in any proceeding or other matter under this section, then the [FCC] shall issue an order preempting the State commission's jurisdiction of that proceeding or matter within 90 days after being notified (or taking notice) of such failure, and shall assume the responsibility of the State commission under this section with respect to the proceeding or matter and act for the State commission."). Finally, even if there were no such provisions for the parties to negotiate rates or for the FCC to set rates such that the absence of interim rates would mean the absence of competition among local exchange carriers, the

---

[2]Indeed, I note that Verizon alleges that it "proposed a voluntary reduction of certain of its UNE rates on an interim basis in order to meet the Commission's goal of expeditiously reducing rates," but that this proposal was rejected. Compl. ¶ 29.

fact remains that Congress did not provide in the Act for rates — interim or otherwise — that are binding but that nevertheless do not comply with federal law and regulations such as the TELRIC methodology. *See AT&T Communications of Illinois, Inc.* v. *Illinois Bell Telephone Co.*, 349 F.3d 402, 411 (7th Cir. 2003) ("[T]he possibility of repair in the future is no warrant for promulgating today a rate that deviates from the TELRIC standard. Federal law requires that any rate for unbundled network elements, adopted by a state commission, comply with TELRIC when adopted."). We are not a junior varsity legislature; neither is the CPUC. *Cf. Mistretta* v. *United States*, 488 U.S. 361, 427 (1989) (Scalia, J., dissenting). We both must abide by what Congress has provided and live without that which it has withheld.

Thus, I would conclude that the interim rate order here is sufficiently final for judicial review.

### B. The Hardship to the Parties of Withholding Judicial Consideration

#### 1. Verizon's Alleged Uncompensable Harm

In its complaint seeking declaratory and injunctive relief, Verizon alleged that the CPUC's interim rate order caused immediate harm to Verizon by requiring Verizon both: (1) to subsidize CLECs in the form of unlawfully low rates, which resulted in Verizon's loss of retail customers; and (2) to bear the credit risk that the CLECs benefitting from the interim rates will not exist at the time the true-up takes effect or will lack the wherewithal to pay the difference between the interim rates and the permanent rates for the period of time the interim rates were in effect. Verizon further alleged that the promised true-up would not compensate Verizon for either of these harms:

> ILECs would be irreparably harmed if state commissions could impose artificially low UNE rates sub-

ject to the promise of a later true-up. *Even assuming that a true-up were actually to occur at some future date, the [interim] Rate Order's below-cost UNE rates cause Verizon California irreparable harm because they give CLECs an arbitrary competitive advantage that allows them to take customers away from Verizon California. This harm cannot be cured by the prospect of a future true-up of the Commission's erroneous rates.* Moreover, any true-up could be years away, thus exacerbating the harm. *There is, moreover, no guarantee that CLECs who have received the benefit of below-cost rates will still exist and have the resources to pay back their windfall — let alone do so willingly without protracted litigation — at some future point when the Commission corrects its erroneous rates.*

. . . .

. . . . As a result of the interim UNE rates set by the Commission, Verizon California has been aggrieved within the meaning of Section 252(e)(6) of the 1996 Act, 47 U.S.C. § 252(e)(6). California's "interim" UNE rates will enable Verizon California's competitors to procure UNEs from Verizon California at rates well below Verizon California's costs of providing UNEs. *Further, they will enable Verizon California's competitors to win over Verizon California's customers, not because the competitors are more efficient or innovative, but because they have won a substantial regulatory windfall in the form of below-cost UNE rates.*

Compl. ¶¶ 44, 46 (emphasis added).[3]

---

[3]There is, in my view, no merit in the argument by the CPUC and the intervenors that harm resulting from Verizon's loss of customers is not cognizable because the very purpose of the Act is to promote competition

Nor does the CPUC contest that the future true-up will afford Verizon no real remedy for the losses Verizon alleged. Indeed, at oral arguments, the CPUC conceded not only that the true-up as contemplated will not account for these losses, but that federal law would not permit the CPUC to set future rates so as to compensate Verizon for past harms resulting from artificially low rates. Jan. 12, 2005 Oral Arg. at 00:33:59-00:34:58.

The CPUC's stated position at oral arguments is quite correct. Where any party requests compulsory arbitration by the state utilities commission, the commission "shall . . . establish any rates for . . . network elements according to subsection (d) of this section." 47 U.S.C. § 252(c)(2). Subsection (d) requires in relevant part that "[d]eterminations by a State commission of . . . the just and reasonable rate for network elements . . . shall be . . . based on the *cost* . . . of providing the . . . network element . . . and . . . may include a reasonable *profit*." 47 U.S.C. § 252(d) (emphasis added). The FCC, in turn, promulgated regulations interpreting this subsection:

> The 1996 Act requires the states to set prices for interconnection and unbundled elements that are *cost-based, nondiscriminatory, and may include a reasonable profit*. To help the states accomplish this, the Commission concludes that the state commissions should set arbitrated rates for interconnection and access to unbundled elements pursuant [to] a forward-looking economic cost pricing methodology. *The Commission concludes that the prices that new entrants pay for interconnection and unbundled*

in the intrastate telecommunications markets. Competition does not typically demand that firms *subsidize* their competitors, which, according to Verizon, is precisely what has happened here. Nor does the Act suggest otherwise. I hasten to add, however, that I express no opinion as to whether Verizon has proven or, on remand, will be able to prove its allegations that the interim rates here are unlawfully low.

*elements should be based on the local telephone companies Total Service Long Run Incremental Cost of a particular network element, which the Commission calls "Total Element Long-Run Incremental Cost" (TELRIC), plus a reasonable share of forward-looking joint and common costs.*

11 F.C.C.R. 15,499, at ¶ 29 (1996) (emphases added), *as amended by* 11 F.C.C.R. 22,301 (1996); *see also* 47 C.F.R. § 51.505.[4] There is, in short, no provision either in the Act or in the FCC's regulations for rates to be based so as to compensate ILECs for past damages of the sort alleged here.

The CPUC and the intervenors argue, however, that any such alleged harm is temporary or speculative or is otherwise not cognizable under the ripeness doctrine either because the interim rates do not require Verizon to alter its "conduct" or because the harm is mere financial loss. I address each of these arguments in turn.

---

[4]The Supreme Court has explained the TELRIC methodology as follows:

> "The TELRIC of an element has three components, the operating expenses, the depreciation cost, and the appropriate risk-adjusted cost of capital." A concrete example may help. Assume that it would cost $1 a year to operate a most efficient loop element; that it would take $10 for interest payments on the capital a carrier would have to invest to build the lowest cost loop centered upon an incumbent carrier's existing wire centers (say $100, at 10 percent per annum); and that $9 would be reasonable for depreciation on that loop (an 11-year useful life); then the annual TELRIC for the loop element would be $20.

> The actual TELRIC rate charged to an entrant leasing the element would be a fraction of the TELRIC figure, based on a "reasonable projection" of the entrant's use of the element (whether on a flat or per-usage basis) as divided by aggregate total use of the element by the entrant, the incumbent, and any other competitor that leases it.

*Verizon Communications Inc.*, 535 U.S. at 496 & n.16 (citations omitted).

*First*, the CPUC and the intervenors argue that Verizon's harm is only temporary or speculative because any retail customers that Verizon may lose while the interim rates are in effect may return once the permanent rates are set, and because the true-up will compensate Verizon for any difference in the rates it charges CLECs under the interim rate order and what it will be able to charge CLECs under the permanent rate order. As for the loss of retail customers, even assuming that every customer who allegedly left Verizon under the interim rates returns under the permanent rates,[5] Verizon will not be compensated for the loss of revenue from the loss of such retail customers while the interim rates were in effect. The true-up adjustment will be based on the cost of the UNEs, and not on the basis of what the competitors' retail customers might have paid Verizon had they not changed service providers.

As for the adjusted rates that Verizon may charge pursuant to the true-up for the interim period, the credit risk that Verizon has been forced to bear exists independently of whether the intervenors and other CLECs ultimately pay the true-up. If an investor is forced to accept junk bonds, of equal amount and maturity, in place of Treasury bonds, he may buy credit insurance; but the insurance premium will reduce his return. Similarly here, were Verizon to buy credit insurance on the intervenors' payments pursuant to the true-up, the cost of such credit insurance is not an element of TELRIC.[6] Thus, nothing about Verizon's alleged present uncompensable harm is con-

---

[5]Nor is there reason to so assume. In the parlance of economists, given the transaction costs that customers bear when they switch service providers and given the price differentials among service providers under the interim rates relative to those under the permanent rates, it may not be efficient for customers to return to Verizon even if was efficient for them to leave in the first place.

[6]Of course, Verizon — like the junk-bond holder — could choose to run the risk of nonpayment, with the predictable effect on its financial statements and own creditworthiness, but that is an option some might not think prudent in these days of vigilance over corporations.

tingent upon future events and, thus, as alleged, is either temporary or speculative. Cases in which this court and others have found claims to be unripe for judicial review on the basis of the alleged harm being temporary or speculative are therefore inapposite.

*Second*, the CPUC and the intervenors argue that Verizon's alleged harm is not cognizable under the hardship prong of the ripeness analysis because the interim rate order does not require Verizon to alter its "conduct" but only its rates. Here, the CPUC and the intervenors rely on language in cases stating that claims are ripe for review only when the challenged agency action requires a change in "conduct." *E.g.*, *Abbot Laboratories*, 387 U.S. at 153 (holding that "where a regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance, access to the courts . . . must be permitted"); *Association of American Medical Colleges* v. *United States*, 217 F.3d 770, 783 (9th Cir. 2000) ("Courts typically read the *Abbott Laboratories* rule to apply where regulations require changes in present conduct on threat of future sanctions."). I can discern no reason why setting rates should not be considered "conduct," nor do the cases support such a position. Indeed, even the cases on which the CPUC and the intervenors rely make clear that the references to changes in "conduct" are meant to distinguish situations where the agency action has "direct and immediate" impact on plaintiffs from situations in which the impact may be indirect or speculative. *Abbott Laboratories*, 387 U.S. at 152-53; *Association of American Medical Colleges*, 217 F.3d at 783-84 (distinguishing *Abbott Laboratories* from its companion case, *Toilet Goods Association, Inc.* v. *Gardner*, 387 U.S. 158, 163-65 (1967), wherein the Supreme Court found the challenged action not ripe for judicial review, on the grounds that "the impact of the regulation was [there] not 'felt immediately by those subject to it in conducting their day-to-day affairs' "). Here, there is no question that the interim rate order had a direct and immediate effect upon Verizon.

*Third*, the CPUC and the intervenors correctly note that we have often stated that mere financial loss is not a cognizable harm for purposes of the hardship analysis under the ripeness doctrine. *E.g.*, *Principal Life Insurance Co.*, 394 F.3d at 670; *US West*, 193 F.3d at 1118; *Village of Gambell* v. *Babbitt*, 999 F.2d 403, 408 (9th Cir. 1993); *Municipality of Anchorage* v. *United States*, 980 F.2d 1320, 1325-26 (9th Cir. 1992); *Dietary Supplemental Coalition, Inc.* v. *Sullivan*, 978 F.2d 560, 562, 564 (9th Cir. 1992); *Western Oil & Gas Association*, 905 F.2d at 1291; *Winter*, 900 F.2d at 1325. However, Verizon has alleged the loss of customers, which is not mere financial loss. *See Midcoast Interstate Transmission, Inc.* v. *Federal Energy Regulatory Commission*, 198 F.3d 960, 969-70 (D.C. Cir. 2000) (holding that the petitioners for review of agency orders were sufficiently aggrieved from the resulting loss of customers that their claims were ripe for judicial review).

Further, to the extent Verizon's alleged harm can be characterized as mere financial loss, although we have often repeated the refrain that mere financial loss is insufficient to establish hardship, none of the cases cited above turn on the fact that the loss was merely financial. Indeed, I have found only two cases in which we held that claims were unripe for judicial review at least in part because the harm was mere financial loss, both of which are readily distinguishable from the case here, either because there was no suggestion that the financial loss was uncompensable or because the challenged action was otherwise not ripe for judicial review. *State of California, Department of Education* v. *Bennett*, 833 F.2d 827, 833-34 (9th Cir. 1987) (holding unripe for judicial review the California Department of Education's claim that Bennett was without authority to charge prejudgment interest on misapplied Title I funds because "the harm that is presaged is limited to financial expense," but there, in the event that the California Department of Education ultimately prevailed, it would suffer no harm because it would not be required to pay the prejudgment interest); *Hawaiian Electric Co.* v. *United*

*States Environmental Protection Agency*, 723 F.2d 1440, 1445 (9th Cir. 1984) ("HECO's alleged financial hardship . . . is insufficient to outweigh the inappropriateness of the issues for judicial resolution."). Moreover, we have held that agency action that delayed indefinitely "recover[y] in tort" and "reimbursement for . . . compensation payments" "creat[ed] a practical hardship" sufficient to render a claim ripe for judicial review. *Chavez* v. *Director, Office of Workers Compensation Programs*, 961 F.2d 1409, 1415-16 (9th Cir. 1992).

Finally, that the alleged harm here is uncompensable by means of the true-up is significant. The refrain regarding financial loss repeated in each of these cases was first uttered by the Supreme Court in *Abbott Laboratories*. There, the Supreme Court agreed with an argument advanced by the government that " 'mere financial expense' is not a justification for *pre-enforcement* judicial review," holding that "possible financial loss is not by itself a sufficient interest to sustain a judicial challenge to governmental action." *Abbott Laboratories*, 387 U.S. at 153 (emphasis added). That mere financial loss would not typically justify *pre-enforcement* judicial review is not at all surprising because typically "adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation." *See Los Angeles Memorial Coliseum Commission* v. *National Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980) (quoting *Sampson* v. *Murray*, 415 U.S. 61, 90 (1974)); *cf. Toilet Goods Association*, 387 U.S. at 164-65 (holding that the challenge to administrative action was not ripe for judicial review in part because "no irremediable adverse consequences [would] flow from requiring a later challenge to this regulation"). There is no reason to conclude that is the case here.[7]

---

[7]In so concluding, I do not assume that the statutory provisions providing for federal review of "determination[s]" by state utilities preclude relief in the form of damages. *See Verizon Maryland Inc.* v. *Public Service Commission of Maryland*, 535 U.S. 635, 643-44, 647-48 (2002) (holding that the provision for federal review of "determination[s]" by state utilities

## 2. Procedural Context

The resolution of the appeal, then, must turn on whether Verizon's allegations were sufficient to support its claim of hardship or, rather, whether the district court was correct to dismiss Verizon's claims in the absence of evidence of Verizon's hardship. Before considering this question, however, three preliminary points must be made regarding the procedural context in which the district court's orders were rendered.

*First*, at no point did the CPUC nor the intervenors file a cross-motion for summary judgment nor a motion to dismiss.

---

in 47 U.S.C. § 252(e)(6) neither limits the general grant of jurisdiction in 28 U.S.C. § 1331 nor "places [any] restriction on the relief a court can award"); *BellSouth Telecommunications, Inc.* v. *Georgia Public Service Commission*, 400 F.3d 1268, 1271 (11th Cir. 2005) (affirming the district court's judgment against a state utilities commission for damages that BellSouth Telecommunications suffered as a result of the commission's prior unlawfully established rates). Rather, I note only that the question of whether sovereign immunity would preclude Verizon from suing the CPUC for damages is very much unsettled. *Compare MCI Telecommunication Corp.* v. *Bell Atlantic-Pennsylvania*, 271 F.3d 491, 509-13 (3d Cir. 2001) (holding that states waive their sovereign immunity by voluntarily participating in the scheme established by the Act), *AT&T Communications* v. *BellSouth Telecommunications Inc.*, 238 F.3d 636, 643-47 (5th Cir. 2001) (same), *MCI Telecommunications Corp.* v. *Illinois Bell Telephone Co.*, 222 F.3d 323, 338-44 (7th Cir. 2000) (same), *MCI Telecommunications Corp.* v. *Public Service Commission of Utah*, 216 F.3d 929, 935-39 (10th Cir. 2000) (same), *US West Communications, Inc.* v. *TCG Seattle*, 971 F. Supp. 1365, 1368-70 (W.D. Wash. 1997) (same), *with Bell Atlantic Maryland, Inc.* v. *MCI WorldCom, Inc.*, 240 F.3d 279, 290-94 (4th Cir. 2001) (holding that states do not waive their sovereign immunity by participating in the scheme established by the Act), *vacated on other grounds sub nom. Verizon Maryland Inc.* v. *Public Service Commission of Maryland*, 535 U.S. 635 (2002), *GTE North, Inc.* v. *Strand*, 209 F.3d 909, 922 n.6 (6th Cir. 2000) ("[I]t is virtually certain that a state utility commission's decision to accept regulatory authority under the [Act] cannot legitimately be construed as a valid waiver of sovereign immunity.").

*Second*, in their brief in opposition to Verizon's motion for partial summary judgment, neither the intervenors nor apparently the CPUC presented any *evidence* contradicting Verizon's claims of irreparable harm. Further, in its reply brief in support of its motion, Verizon specifically reserved the opportunity to make a showing that Verizon had suffered and would continue to suffer irreparable harm if the district court deemed such a showing necessary.

*Third*, once the district court denied in part Verizon's motion for summary judgment and dismissed Verizon's first two claims, Verizon had no meaningful opportunity to present evidence to substantiate its claim of hardship. The district court's order dismissing Verizon's first two claims in no way invited Verizon to submit evidence that its remaining claims were ripe. Rather, the district court held that "[i]t appears that the Court's ruling on ripeness grounds also forecloses Plaintiff's remaining three causes of action," but permitted Verizon to file "a written response demonstrating why its *remaining three claims* should not be dismissed *following the Court's ripeness ruling*." *Verizon California, Inc.* v. *Peevey*, No. C03-2838 THE, slip op. at 6-7 (N.D. Cal. Jan. 13, 2004) (emphasis added). In other words, the district court was inviting Verizon to demonstrate why the district court's reasoning as to the first two claims was not also applicable to the remaining three claims. Further, even if Verizon did take the opportunity to present evidence, that would not have impacted the district court's ruling as to the first two claims. *The court never suggested that it would reconsider its dismissal of the first two claims.*

Thus, at the time the district court denied Verizon's motion for partial summary judgment and dismissed Verizon's first two claims, Verizon had repeatedly alleged irreparable harm, and neither the CPUC nor the intervenors had filed a dispositive motion nor introduced evidence to the contrary. Further, once the district court denied Verizon's motion for partial

summary judgment and dismissed Verizon's first two claims, Verizon had no meaningful opportunity to present evidence.

### 3.   The District Court's Order

In denying Verizon's motion for partial summary judgment and dismissing Verizon's first two claims (and, later, the remainder of Verizon's complaint), the district court first held as a matter of law that Verizon's allegations of irreparable harm were irrelevant. As the district court stated: "The only discernible difference between this case and *US West v. MFS* appears to be that US West admitted that its concerns would be resolved by the pending true-up, whereas Verizon disputes this issue. The Court is unconvinced that this difference is material." The district court then held in the alternative that even if *US West* did not control the case, the court would still hold that Verizon's claims were not ripe for judicial review because "possible financial loss is not sufficient to establish hardship" and Verizon's arguments regarding loss of customers "rests on pure speculation, and such speculative harm does not constitute irreparable injury." *Id.* at 4-6.

The district court's first holding was error, as explained in Part I above. Indeed, I can think of no more of a material difference to ripeness analysis than that US West stipulated it could recover its claimed damages through a true-up while Verizon claims it cannot, and the CPUC agrees with Verizon. The district court's alternative holding likewise was error. As detailed in Part II.B.1 above, Verizon has alleged that its harm is not compensable through the true-up. This harm, as pleaded, is direct and immediate rather than contingent on future events and thus potentially temporary or speculative. Further, as pleaded, it is cognizable as hardship even to the extent resulting from the setting of rates as opposed to other conduct, and even to the extent limited to mere financial loss. This is sufficient to warrant judicial review, given the procedural posture of the case, as detailed in Part II.B.2 above. "The question of ripeness, like other challenges to a court's

subject matter jurisdiction, is treated as a motion to dismiss under Rule 12(b)(1)," and, thus, "[i]t is the burden of the complainant to *allege* facts demonstrating the appropriateness of invoking judicial resolution of the dispute." 15 *Moore's Federal Practice* § 101.73[1] (2005) (emphasis added).[8]

Thus, in *Gardner* v. *Toilet Goods Association*, 387 U.S. 167, 168-70 (1967), a companion case to *Abbott Laboratories*, Toilet Goods Association challenged regulations promulgated by the Secretary of Health, Education and Welfare and sued for injunctive and declaratory relief. The Secretary moved to dismiss on ripeness grounds, the district court denied the motion, and the Second Circuit affirmed. *Id.* at 170-71 & n.1. The Supreme Court likewise affirmed, *id.* at 170, holding in relevant part: "We cannot say on this record that the burden of [compliance with the regulations at issue] is other than substantial, *accepting, as we must on a motion to dismiss on the pleadings, the allegations of the complaint and supporting affidavits as true*." *Id.* at 172 (emphasis added).

Likewise, in *Midcoast Interstate Transmission, Inc.*, Midcoast petitioned for review of the Federal Energy Regulatory Commission's ("FERC") orders granting Southern Natural Gas Company's ("Southern") application to construct a natural gas pipeline and, as is relevant here, FERC's order that Southern could recover the cost of the new pipeline construction through "rolled-in" rather than "incremental" pricing. *Midcoast Interstate Transmission, Inc.*, 198 F.3d at 963-64. In rolled-in pricing, "the cost of the new facilities are added to the pipeline's total rate base and reflected in rates charged to all customers system-wide," whereas in incremental pricing, "an additional charge [is imposed] solely [on those] customers who are directly served by the expansion facilities." *Id.* at

---

[8]I emphasize that in reaching these conclusions, I do *not* rely on any of the evidence that Verizon submitted in connection with its appeal without first having submitted it to the district court.

964. Midcoast claimed that FERC's approval of rolled-in rates ignored the agency's own policy and precedent, *id.*, and contended that "but for that determination, it would not be faced with the loss of the Cities' business upon completion of the North Alabama Pipeline." *Id.* at 969. Midcoast reasoned that had FERC required incremental pricing, Southern's rates for users of the North Alabama Pipeline would have been so high relative to the rates that Midcoast proposed to charge for a competing project that FERC would not have authorized the construction of Southern's North Alabama Pipeline. *Id.*

The D.C. Circuit — which, I note, has particular expertise in administrative law — held:

> If [Midcoast's] claim survives analysis, there can be no question that Midcoast has suffered a certain, concrete injury that satisfies both the statutory and constitutional requirements for judicial review.
>
> Whether Midcoast is aggrieved is a question of fact; and where they are in dispute, *a court must assume the correctness of the challenging party's version of the facts*. . . .
>
> . . . . Midcoast has presented facts which, if correct, fully support a finding that it has been aggrieved by the pricing determination. . . .
>
> *Accepting, as we must for purposes of our analysis, the accuracy of Midcoast's calculation of the incremental rate Southern would be required to charge*, we are satisfied that Midcoast has been aggrieved. As a direct consequence of the agency's action and *irrespective of the outcome of a future rate proceeding*, Midcoast will have lost the Cities' business from the moment the North Alabama Pipeline begins deliveries of natural gas until the time that the Cities

are released from their obligations under the Southern contracts. . . .

It is for this reason that we also find the issue ripe for review. . . . *Because Midcoast faces an imminent loss irrespective of the outcome of a future rate proceeding, there can be no question that the Commission's pricing determination is ripe for review* under the classic test established in *Abbott Laboratories* v. *Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967): the legality of the rolled-in pricing determination is fit for immediate judicial decision, and the hardship faced by Midcoast is indisputable.

*Id.* at 969-70 (emphases added).

Similarly, in *City of New Orleans* v. *Federal Energy Regulatory Commission*, 67 F.3d 947, 948 (D.C. Cir. 1995), the City of New Orleans and Entergy challenged an order by FERC allowing Entergy to spin-off two electricity generating plants because the order addressed the "prudence" of the spin-off only as to its current effect on rates up until such time as the utility system would need to purchase new capacity. FERC argued that the petitioners were not yet "aggrieved" parties, *id.* at 952, but the D.C. Circuit disagreed:

The challenging parties assert that the transfer will aggrieve them eventually in the form of unreasonable rates, and so was not prudently entered into. *If they are correct, as we must assume them to be for purposes of determining their aggrievement*, they had a right to a review of FERC's decision on the prudence of the transaction in terms of its effect on ratepayers.

*Id.* (emphasis added).

Verizon indisputably "allege[d] facts demonstrating the appropriateness of invoking judicial resolution of the dispute," 15 *Moore's Federal Practice* § 101.73[1] (2005), as detailed in Part II.B.1 above. Nor, as detailed in Part II.B.2 above, did the CPUC nor the intervenors file a cross-motion for summary judgment nor even proffer evidence in responding to Verizon's motion for partial summary judgment that might have obliged Verizon to substantiate its allegations. In this procedural context and particularly given Verizon's specific reservation of the opportunity to present evidence should the district court desire, the district court's *sua sponte* dismissal was error. Accordingly, I join with the majority in vacating the district court's orders denying Verizon's motion for partial summary judgment and dismissing Verizon's complaint, and remanding with instructions that the district court consider on the merits whether Verizon is entitled to the declaratory and injunctive relief (and the costs and attorneys' fees) that it seeks.