# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 03-2735 & 03-2766

AT&T COMMUNICATIONS OF ILLINOIS, INC., *et al.*,

*Plaintiffs-Appellees*,

*v.*

ILLINOIS BELL TELEPHONE CO. and AMERITECH CORP.,

*Defendants-Appellants*.

———————

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
Nos. 03 C 3290 & 03 C 3643—**Charles P. Kocoras**, *Chief Judge*.

———————

ARGUED SEPTEMBER 24, 2003—DECIDED NOVEMBER 10, 2003

———————

Before BAUER, EASTERBROOK, and DIANE P. WOOD, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*. The Telecommunications Act of 1996 requires incumbent local exchange carriers— the "Baby Bell" descendants of American Telephone & Telegraph, spun off in 1982 as part of the divestiture that ended the national telephone monopoly—to provide "unbundled" services to new entrants. One of history's ironies is that AT&T itself, reduced to a long-distance carrier by the 1982 decree, has become one of the principal new entrants into local phone service. Meanwhile the Baby Bells, now grown up, are expanding into long-distance service.

Many carriers offer local and national wireless service within each incumbent's service area. The result is vigorous competition. But much of the competition entails fighting over the spoils of the 1996 Act. New entrants want to combine the "unbundled network elements" into complete packages of services (called local loops) that they can resell in competition with the incumbent—and, if the wholesale price is right, they can underbid the incumbent at retail while still making a profit. The incumbents would like to set the price of "network elements" high enough to make as much per customer when selling services to their rivals at wholesale as they do when selling to customers at retail. Prices for unbundled elements affect not only the allocation of income among producers but also new investment and innovation: if the price to rivals is too low, they won't build their own plant (why make capital investments when you can buy for less, one unbundled element at a time?), and the incumbents won't maintain or upgrade their facilities (why make costly capital investments if you have to sell local loops to rivals for less than it costs to produce them?).

The Federal Communications Commission implemented the 1996 Act by directing the carriers and state utility commissions to set prices using TELRIC—an acronym for "total element long-run incremental cost." See 47 C.F.R. §§ 51.505-.515. TELRIC obliges both incumbents and state regulators to set prices based on the long-run costs that would be incurred to produce the services in question using the most-efficient telecommunications technology now available, and the most efficient network configuration. Incumbents that have aging and inefficient equipment thus must sell for less than their historical cost; the old system that calculated rates based on actual cost of equipment plus a reasonable rate of return on capital is out the window. In *Verizon Communications Inc. v. FCC*, 535 U.S. 467 (2002), the Supreme Court held that TELRIC is a choice within the FCC's discretion.

TELRIC is a framework rather than a formula; there is considerable play in the joints. See *AT&T Corp. v. FCC*, 220 F.3d 607, 615-16 (D.C. Cir. 2000); *Sprint Communications Co. v. FCC*, 274 F.3d 549, 556 (D.C. Cir. 2001). Incumbent carriers may be unable to agree with would-be entrants about what the most efficient technology is, how much it would cost to construct, and what the incremental costs of a given network element would be. Moreover, even when the parties can agree on the technology, they may be unable to agree on vital details. One such detail is the "fill factor." Any sensible carrier builds more network capacity than can be used at the moment; that way capacity will be available as additional customers demand service, without waiting for the arrival of new equipment, excavating streets to lay new wire, and so on. Moreover, many kinds of telecommunications equipment have minimum efficient sizes; a switch able to handle 100,000 circuits may be cheaper than two switches able to handle 50,000 circuits apiece. The fill factor reflects the extent of this (economically justified) unused capacity. If an efficient network configuration would have 50% of the circuits in use and 50% idle—ready for new customers, a shift in demand, or use in the event of a breakdown—then the price per loop to a rival would be the average long-run cost per loop divided by 0.5. If the efficient fill factor were to have 2/3 of the circuits in use, then the price would be the long-run cost divided by 0.667, and so on. The lower the efficient fill factor, the higher the price per loop the incumbent can charge to rivals. And TELRIC does not contain an algorithm for determining the fill factor. The FCC has approved several. In the Triennial Review Order the FCC explained that many issues have a range of reasonable answers for the parties—or state regulators, acting under state law—to flesh out. See Report and Order, FCC 03-36, 68 Fed. Reg. 52,276, 52,284 (Aug. 21, 2003). Moreover, the Commission has opened an investigation of TELRIC's operation to ensure that price does not fall below

the level needed to encourage efficient investment in new facilities by both incumbents and their rivals. See Notice of Proposed Rulemaking, FCC 03-224, 68 Fed. Reg. 59,757 (issued Sept. 15, 2003, and published Oct. 17, 2003).

The first step in arriving at a price for a network element is negotiation between the incumbent and its rival. 47 U.S.C. §§ 251(c)(1), 252(a). If the carriers cannot agree, then the state agency resolves the dispute. 47 U.S.C. §252(b). The statute refers to this as "arbitration," a misleading appellation. Arbitration is final (with the few exceptions provided in 9 U.S.C. §10); the state agency's decision, by contrast, is subject to plenary review in federal district court. 47 U.S.C. §252(e)(6). Having a state agency's decision reviewed by a federal court is another of the 1996 Act's innovations, and like TELRIC it has received the Supreme Court's imprimatur. See *Verizon Maryland Inc. v. Public Service Commission of Maryland*, 535 U.S. 635 (2002).

Shortly after the 1996 Act went into force, AT&T and MCI demanded access to the unbundled elements of Illinois Bell, a subsidiary of Ameritech, one of the original Bell Operating Companies (or BOCs, as the divestiture decree called the Baby Bells). AT&T and MCI sought the complete package of services that would enable a retail customer to use the phone system; the parties call this the "unbundled network element platform" or UNE-P. The parties could not agree on price, so their dispute was resolved in 1997 by the Illinois Commerce Commission. The ICC set a price of about $5 per month per UNE-P in Chicago, and about $12 on average statewide. Retail customers pay an average of about $36 per month for the service one UNE-P creates.

Prices set in 1997 were subject to adjustment by the ICC after five years, and when that time came Illinois Bell asked the ICC to raise the rates it could charge. By then Ameritech had been acquired by SBC, another of the orig-

inal BOCs, and SBC was less willing than Ameritech to accept a low rate—especially not when, by SBC's calculation, it costs $29 per month to supply the UNE-P that fetches $36 from a retail customer but only $12 on average from AT&T or MCI. At the same time, SBC was negotiating with additional potential entrants, or disputing with them before the ICC, and it did not want the $12 average rate to propagate. (For simplicity, we disregard the status of the negotiations, contracts, and proceedings between SBC and rivals other than AT&T and MCI.)

While the ICC had the dispute under advisement, the Illinois legislature enacted 220 ILCS 5/13-408, which established some rules for decision:

> This Section applies to and covers certain unbundled network element rates that shall be charged by incumbent local exchange carriers that are subject to regulation under an alternative regulation plan under Section 13-506.1 of this Act. The General Assembly finds and determines that it should provide direction to the Illinois Commerce Commission regarding the establishment of the monthly recurring rates that such incumbent local exchange carriers shall charge other telecommunications carriers for unbundled loops, whether provided on a standalone basis or in combination with other unbundled network elements, in order to ensure (i) that such rates are consistent with the requirements of the federal Telecommunications Act of 1996, the regulations promulgated thereunder, and subsection (g) of Section 13-801 of this Act, and (ii) that such incumbent local exchange carriers are able to recover the efficient, forward-looking costs of creating, operating, and maintaining the network outside plant infrastructure capacity and switching and transmission network capacity necessary to permit such incumbent local exchange carriers to

meet in a timely and adequate fashion the obligations imposed by Section 8-101 of this Act.

In order to ensure recurring unbundled network element rates for loops that accomplish these objectives, the Illinois Commerce Commission shall set the recurring rates affected incumbent local exchange carriers receive for unbundled loops, whether provided on a standalone basis or in combination with other unbundled network elements, in accordance with the requirements delineated below.

(a) The General Assembly directs that the Illinois Commerce Commission shall employ fill factors (the proportion of a facility or element that will be "filled" with network usage) that represent a reasonable projection of actual total usage of the elements in question, in accordance with applicable federal law. The General Assembly finds that existing actual total usage of the elements that affected incumbent local exchange carriers are required to provide to competing local exchange carriers, as reflected in the current actual fill factors for the elements in question, is the most reasonable projection of actual total usage. The Commission, therefore, shall employ current actual fill factors that reflect such existing actual total usage on a going forward basis in establishing cost based rates for such unbundled network elements. In addition, the Commission shall adjust all existing Commission-approved rates for unbundled loops, whether provided on a standalone basis or in combination with other unbundled network elements, that are currently in effect to make such rates consistent with this provision.

(b) The General Assembly further directs that the Commission shall employ depreciation rates that

are forward-looking and based on economic lives as reflected in the incumbent local exchange carrier's books of accounts as reported to the investment community under the regulations of the Securities and Exchange Commission. Use of an accelerated depreciation mechanism shall be required in all cases. Use of a depreciation rate based on historical rate-of-return regulation derived lives of the elements and facilities in question shall be prohibited. In addition, the Commission shall adjust all existing Commission-approved rates for unbundled loops, whether provided on a standalone basis or in combination with other unbundled network elements, that are currently in effect to make such rates consistent with this provision.

(c) The rate adjustments required by subsections (a) and (b) of this Section must be completed within 30 days of the effective date of this Section. In the case of any incumbent local exchange carrier that is subject to an alternative regulation plan under Section 13-506.1 at the time this Section becomes effective, in making these rate adjustments, the Commission shall determine the specific required adjustments with respect to fill factors and depreciation lives by employing the models and methodology used to generate the proposed rates submitted by such an incumbent local exchange carrier in ICC Docket 02-0864. The Commission proceedings initiated to establish such adjusted rates shall be deemed interconnection agreement arbitration and approval proceedings under Sections 252(b) and (e) of the federal Telecommunications Act of 1996. Immediately upon conclusion of such proceedings, all existing interconnection agreements in this State of affected incumbent local exchange carriers shall be deemed amended to contain the adjusted

rates established in such proceedings. In addition, immediately upon conclusion of such proceedings, all wholesale tariffs, currently effective in this State, of affected incumbent local exchange carriers shall be deemed amended to contain the adjusted rates established in such proceedings. In accordance with these provisions, immediately upon the establishment by the Commission of the adjusted rates covered hereby, each affected incumbent local exchange carrier shall charge such adjusted rates, to the extent applicable, for all of the network element products that are provided to other carriers, whether those products are provided under an interconnection agreement or a tariff. The proceeding in ICC Docket 02-0864 is hereby abated as of the effective date of this amendatory Act of the 93rd General Assembly.

(d) Notwithstanding anything to the contrary contained in Section 13-505.1 of this Act, unbundled network element rates established in accordance with the provisions of this Section shall not require any increase in any retail rates for any telecommunications service.

In other words, within 30 days the ICC had to adjust SBC's rates using its current fill factors and depreciation schedules from its financial statements. Depreciation, like fill factor, is inversely related to price under TELRIC. If economically and technologically efficient equipment would have a useful life of five years, then the TELRIC price to rivals is greater (because cost must be covered faster) than if the life is ten years. The statute told the ICC to use the equipment life spans that SBC had adopted for purposes of financial reporting—and for that purpose firms often use lives as short as the IRS will accept, because shorter lives mean faster depreciation and lower taxes. Through 220 ILCS 5/13-408 the tax-and-accounting lives of SBC's assets

became their economic lives too. The legislation added that AT&T and SBC could not use the ensuing higher wholesale prices as justifications for increased retail rates. The ICC complied with this statute by assuming that all aspects of the 1997 calculation *except* fill factors and depreciation had been frozen. The adjustments required by this statute raised SBC's average statewide rate to $19 per UNE-P. Wholesale prices are lower in central parts of Chicago ($7.81 per month), higher elsewhere. SBC believes that these rates still do not cover its costs; its rivals, however, believe that they exceed TELRIC. (Both propositions could be true, given TELRIC's future-oriented, hypothetical-cost nature.)

Once the ICC made its decision, AT&T and MCI were entitled to commence a challenge in federal court. Instead, they jumped the gun. Invoking the federal-question jurisdiction, they filed suit immediately after the state enacted 220 ILCS 5/13-408 and argued that the 1996 Act preempts this legislation. The district court agreed with this contention and issued an injunction. *Voices for Choices v. Illinois Bell Telephone Co.*, 2003 U.S. Dist. LEXIS 9548 (N.D. Ill. June 9, 2003). (AT&T tried to give the suit a public-interest patina by making "Voices for Choices"—which despite its name is a trade association rather than a consumers' group—the lead plaintiff. The appellate brief reveals that AT&T's lawyers also represent Voices for Choices, which presents no arguments on its own behalf; we have changed the caption to reflect the real parties in interest.) The district court held that the statute is defective in two ways: First, federal law makes the state regulatory commission the exclusive source of non-federal substantive rules; second, the particular statutory rules for the handling of fill factors and depreciation conflict with TELRIC.

The decision to file suit before the ICC had applied the statute and announced new rates has caused unnecessary troubles. Congress provided for federal judicial review of

*rates* set by state commissions; it did not provide for review of individual factors that influence those rates. A lower fill factor, which elevates the rate, may be offset by other factors that depress it. As long as the final rate comports with TELRIC, why should it matter what role particular intermediate factors played? Any effort to analyze a factor in isolation poses a distinct risk of generating an advisory opinion, as well as a certainty of complicating review of the rate ultimately announced. A different way to put this is that review of agency action usually is limited to the agency's final decision, and the choice of one or two legal criteria that the agency will use along the way cannot be called a "final" decision. See, e.g., *FTC v. Standard Oil Co. of California*, 449 U.S. 232 (1980). By the time the district court entered its injunction, the ICC had completed its work (the statute gave it only 30 days, after all); it would have been easy enough to wait that short time to ensure that the ICC's final decision was before the district court.

Making this suit a challenge to the particular rules of decision in the new statute also complicated the crafting of relief. The district court apparently did not see any difficulty, however, because it entered this brief injunction:

> (1) summary judgment is entered for plaintiffs;
>
> (2) 220 ILCS 5/13-408 & 13-409 are declared unlawful; and
>
> (3) defendants are permanently enjoined from implementing these provisions of the Illinois Public Utilities Act.

What does this mean? "Implementing the provisions" of the statute was a task for the ICC—which completed its work before the district judge acted. What, then, does this injunction do? Must the ICC rescind its order? (So far it has not done so.) Must the ICC reopen, and decide under former law, the pending proceedings that the statute displaced? (Again it has not done so, though one would suppose that

this is essential.) May SBC charge the rates established in the order that had issued before the injunction entered? If not, may SBC increase rates on its own authority (the old agreements with AT&T and MCI having expired) and wait for them to demand "arbitration" before the ICC? The injunction does not address any of these important issues. At oral argument, counsel for AT&T revealed that the parties had drafted this language, and that the judge signed what was put before him; as the parties themselves know what they meant, they did not think it important to write it down. This is not a satisfactory explanation. How are we to review this order—it is, after all, the final decision now on appeal—if the key to its meaning lies in the private consultations among counsel? How could a court enforce this order if only the private litigants, and not either the ICC or the judiciary, know what the order means?

These difficulties are connected to a third problem: the ICC and its members, though parties to the litigation, have not appealed. The agency did not welcome the statutory restrictions on its discretion and was happy to have the judge rid it of them. The judiciary thus became involved in a power play among branches of the state government. (The legislature and the Governor favored the new law; the commissioners did not.) Because the agency did not appeal—and no other state official attempted to compel it to do so—it is forbidden to enforce the new law no matter *what* happens on this appeal. That raises the question whether there is a continuing case or controversy. As long as the agency is bound by the injunction, what relief could an appeal offer to SBC? See *Kendall-Jackson Winery, Ltd. v. Branson*, 212 F.3d 995 (7th Cir. 2000). We directed the parties to file supplemental memoranda about this question and the related question whether SBC may set its own rates, now that the ICC's order has been knocked out.

The answers to our questions—answers received not only in the supplemental memoranda but also at oral argu-

ment—reveal that the three difficulties we have mentioned (prematurity, vague injunction, and the availability of effective relief given the ICC's acquiescence) are related. The parties agree that: (1) the injunction, read in connection with SBC's agreements and the ICC's 1997 decision, compels SBC to continue charging the rate promulgated in 1997, whether or not that rate is today appropriate under TELRIC; (2) what 220 ILCS 5/13-408 does is not only compel the ICC to change the fill factors and depreciation but also forbid the ICC to make any other adjustment during its 2003 ratemaking; and (3) the combination of (1) and (2) means that this suit really is a review of the final rate prescribed by the ICC, for these two factors were the whole ball game rather than components of a more complex calculation. These propositions might have been debatable, individually or collectively; certainly the statute does not say in so many words that the ICC is forbidden to adjust other factors. But the parties' agreement reflects the ICC's actual conduct and the parties own conduct: SBC has continued to charge the 1997 rates. This shows that there is a live controversy: a carrier is entitled to appellate review of the final rate (which affects ongoing income) whether or not the regulatory commission contests the district court's decision. These three propositions also indirectly resolve the substance of the parties' dispute and compel us to affirm—not, however, on the district court's grounds.

The district judge thought that the 1996 Act bars state legislatures from playing any role in ratemaking. Yet nothing in the federal statute says this. Federal law names the state public utilities commission as regulator and adjudicator ("arbitrator"), but this does not imply that the agency is the sole source of substantive rules any more than Article III's commitment of adjudication to the federal judiciary implies that judges alone make up the rules by which cases are decided. See *Robertson v. Seattle Audubon Society*, 503 U.S. 429 (1992). An attempt by the state

legislature to set rates by itself would transgress the federal statute, which departs from the older approach under which ratemaking was a legislative prerogative. See *St. Joseph Stock Yards Co. v. United* States, 298 U.S. 38, 50 (1936); *Minnesota Rate Cases*, 230 U.S. 353, 433 (1913). (Illinois has not argued that the 1996 Act invades its sovereign prerogative to reallocate powers internally, so we need not determine whether, by participating in the cooperative state-federal system established by the Act, Illinois has waived such a contention.) But neither the 1996 Act nor its implementing regulations goes to the other extreme, excluding all legislative activity despite the longstanding tradition that delegation to agencies comes with some legislative standard-making. See *Wichita R.R. & Light Co. v. Public Utilities Commission of Kansas*, 260 U.S. 48, 58-59 (1922). As long as federal law leaves a gap-filling role for the states—and the FCC believes that its TELRIC rules leave a good deal of discretion to states, see *First Report & Order*, 11 F.C.C. Record 15,499 ¶¶ 22, 53 (1996)—there is no reason why legislation cannot be a source of substantive norms. The 1996 Act contains a general anti-preemption clause, see 47 U.S.C. §609 note ("This Act and the amendments made by this Act shall not be construed to modify, impair, or supersede Federal, State, or local law unless expressly so provided in such Act or amendments"), which precludes a reading that ousts the state legislature by implication.

The district judge also thought that any use of actual fill factors (or asset lives matching the company's financial reports) violates federal law because TELRIC is forward looking, while depreciation looks to the past and fill factors to the present. True enough, TELRIC calls for a projection, but it does not demand that every ingredient be hypothetical. How could one know the long-run costs of the most efficient technology without understanding the costs of today's most efficient producers? If SBC's current fill factors are the

efficient ones (or are within the range that a student of the subject might think a reasonable estimate of that figure), then they are exactly the right figures to use. What is more, as we have mentioned, TELRIC requires that the *rate* reflect the costs of efficient production, not that each ingredient of the formula do so independently. The district court's analysis may have been affected by the parties' choice to present for decision a challenge to two factors, standing alone, rather than a challenge to a promulgated rate. Both of these factors look to the present or the past; if they were the *only* factors, then the problem would be clear; but under TELRIC they can't be the only factors, and their propriety should not have been evaluated in isolation from the other components of a TELRIC rate.

Which brings us to the problem: The state law, as the ICC understood and applied it, *does* require these factors to be used in isolation. The ICC took as set in stone all ingredients of ratemaking from 1997, and it adjusted the rate only by changing fill factors and asset lives. That approach conflicts with the 1996 Act and the TELRIC methodology and is therefore preempted. See *Wisconsin Bell, Inc. v. Bie*, 340 F.3d 441 (7th Cir. 2003). Technology has changed since 1997; it cannot be that *every* rate-influencing consideration (other than fill factor and asset lives) has remained constant over the last six years. A rate for unbundled network elements generated by combining some factors that are six years out of date with two other factors that are not forward-looking cannot possibly satisfy the requirements of federal law. At oral argument counsel for SBC contended that this could be solved in a new ratemaking next year, when AT&T or MCI or some other rival could ask the ICC to reexamine the other components that produced the final rate. But the possibility of repair in the future is no warrant for promulgating today a rate that deviates from the TELRIC standard. Federal law requires that any rate for unbundled network elements, adopted by a state commission, comply

with TELRIC when adopted. The rate adopted by the ICC did not do this and was properly set aside.

Where does this leave matters? The injunction still bars the ICC from using 220 ILCS 5/13-408 to set rates. If the elected branches of state government want the Commission to proceed along these lines, they must enact new legislation that addresses fill factors and asset lives as elements of a comprehensive process designed to generate a rate that complies with TELRIC. The ICC also is compelled by the injunction to reinstate the proceeding in its Docket 02-0864, which the state law had terminated, and to proceed to decision as expeditiously as possible. The ICC must attempt to produce a rate that complies with TELRIC as of 2003—and if doing this entails use of SBC's current fill factors, the ICC is free to use them. And it must do this speedily. A rate that is long out of date, as this 1997 rate is, frustrates the goals of TELRIC every bit as much as does a rate generated under the flawed state legislation. SBC and its rivals alike are entitled to an updated rate that comports with federal law.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*

USCA-02-C-0072—11-10-03